No. 24-11306

---

United States Court of Appeals
For the Eleventh Circuit

---

EZEMARVAL, LLC, D/B/A MIACARGO GROUP,
*Plaintiff-Appellant,*

v.

EL INSTITUTO POSTAL DOMINICANO,
*Defendant-Appellee.*

---

**ANSWER BRIEF OF EL INSTITUTO POSTAL DOMINICANO**

---

*On Appeal from the U.S. District Court
for the Southern District of Florida
Hon. Jose E. Martinez
Case No. 22-cv-21822*

---

Keith Bradley
Kayla Marie Mendez
717 17th Street, Suite 1825
Denver, CO 80202
Tel.: (303) 830-1776
Fax: (303) 894-9239
keith.bradley@squirepb.com
kayla.mendez@squirepb.com

Raúl B. Mañón
200 South Biscayne Blvd., Suite 3400
Miami, FL 33131
Tel.: (305) 577-7000
Fax: (305) 577-7001
raul.manon@squirepb.com

SQUIRE PATTON BOGGS (US) LLP

*Counsel for El Instituto Postal Dominicano*

i

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1, Defendant-Appellee El Instituto Postal Dominicano ("Inposdom") discloses the names of all trial judges, attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of the particular case or appeal, including subsidiaries, conglomerates, affiliates, parent corporations, any publicly held corporation that owns 10% or more of the party's stock, and other identifiable legal entities related to a party:

1. Bradley, Keith (Attorney for Appellee)

2. Duane Morris LLP (Attorneys for Appellant)

3. El Instituto Postal Dominicano (Appellee)

4. Ezemarval, LLC (Appellant)

5. Gomez Nombela, Maria (Attorney for Appellee)

6. Kruppa, Andrew R. (Attorney for Appellee)

7. Mañón, Raúl B. (Attorney for Appellee)

8.  Marroquin, Jessica (Attorney for Appellant)

9.  Martinez, Jose E. (U.S. District Court Judge)

10. Mendez, Kayla Marie (Attorney for Appellee)

11. Palumbos, Robert M. (Attorney for Appellant)

12. Squire Patton Boggs (US) LLP (Attorneys for Appellee)

13. Williams, Stewart Dorian (Attorney for Appellant)

Appellee certifies that, to the best of its knowledge, no publicly traded

company or corporation has an interest in the outcome of this case or appeal.

## CORPORATE DISCLOSURE STATEMENT

1.    Appellee the Instituto Postal Dominicano is an instrumentality of the Dominican Republic, a foreign state, under 28 U.S.C. §1603(b).

2.    There is no publicly-held corporation that owns 10% or more of the Instituto Postal Dominicano's stock.

## STATEMENT REGARDING ORAL ARGUMENT

Defendant-Appellee El Instituto Postal Dominicano ("Inposdom") does not believe this case presents complex or novel issues warranting oral argument.

## TABLE OF CONTENTS

Page

Jurisdiction...................................................................................I

Introduction..................................................................................I

Issues Presented ........................................................................ 3

Statement of the Case................................................................4

     A.    A fictitious contract purported to expose Inposdom
          to a $10-million penalty in U.S. courts.................................. 5

     B.    Inposdom terminated the 2020 Agreement but not
          the Faux-Contract that it did not know about..................... 7

     C.    Ezemarval invoked U.S. judicial authority to enforce
          the fictitious $10-million penalty....................................... 10

Argument Summary ............................................................... 12

Standard of Review ................................................................15

Argument ................................................................................17

  I.    Peguero had no authority to enter the Faux-Contract or
         waive Inposdom's immunity from U.S. courts. ........................... 18

     A.    Peguero's purported source of authority was false. .......... 21

     B.    The Board had no authority to waive Inposdom's
          sovereign immunity................................................................23

     C.    The Faux-Contract was beyond Peguero's and the
          Board's authority in multiple other ways. .......................... 27

     D.    Ezemarval waived further dispute about whether
          Dominican law authorized Peguero or the Board to
          enter the Faux-Contract or the immunity waiver.............. 31

E.    Dominican law establishes the scope of authority for Peguero and the Board. ............................................................ 33

F.    Actions by Peguero and Ezemarval cannot establish Peguero's actual authority. ..................................................... 38

II.    Inposdom did not ratify the purported agreement or convey any impression of apparent authority for Peguero. ...... 40

A.    Inposdom did not ratify Peguero's illegitimate signing of the Faux-Contract ................................................. 45

1.    Inposdom engaged in no conduct manifesting a consent to be bound by the Faux-Contract. ............. 46

2.    Ezemarval has not shown Inposdom actually retained the alleged equipment ................................. 49

3.    Inposdom did not know about the Faux-Contract. . 50

B.    Inposdom did not convey any appearance of authority for Peguero to sign the Faux-Contract ............... 55

III.    Ezemarval has not alleged or proven the "commercial activity" exception ............................................................. 60

A.    The case is not connected to "commercial activity" by Inposdom. ................................................................. 61

B.    Ezemarval's claim is not "based on" an act by Inposdom. ................................................................. 62

C.    Even if Inposdom had terminated the Faux-Contract, the demanded performance was not due yet. ........................................................................ 65

D.    Ezemarval's case is not "based on" a failure to return equipment. ..................................................... 67

E.    The alleged failure to pay had no "direct effect" in the United States ......................................................... 68

CONCLUSION ..................................................................... 74

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Access Now, Inc.* v. *Southwest Airlines Co.*,
  385 F.3d 1324 (11th Cir. 2004) ............................................................. 18

*Aquamar S.A.* v. *Del Monte Fresh Produce N.A., Inc.*,
  179 F.3d 1279 (11th Cir. 1999) .......................................... 33, 34, 35, 36

*Araya-Solorzano* v. *Gov't of the Repub. of Nicaragua*,
  562 F. App'x 901 (11th Cir. 2014) ................................................... 70, 75

*Architectural Ingenieria Siglo XXI, LLC* v. *Dominican Republic*,
  788 F.3d 1329 (11th Cir. 2015) ........................................................ 30, 31

*Arriaga* v. *Fla. Pac. Farms LLC*,
  305 F.3d 1228 (11th Cir. 2002) ............................................. 40, 44, 56

*Arriba Ltd.* v. *Petroleos Mexicanos*,
  962 F.2d 528 (5th Cir. 1992) ................................................................ 20

*Auvil* v. *Grafton Homes, Inc.*,
  92 F.3d 226 (4th Cir. 1996) ................................................................. 59

*Bonner* v. *City of Prichard*,
  661 F.2d 1206 (11th Cir. 1981) *(en banc)* ............................................. 22

*Burrell* v. *Bd. of Tr. of Ga. Mil. Coll.*,
  125 F.3d 1390 (11th Cir. 1997) ........................................................... 31

*CapitalKeys, LLC* v. *Democratic Repub. of Congo*,
  No. 15-2079, 2021 WL 2255362 (D.D.C. June 3, 2021) ..................... 20

*CapitalKeys, LLC* v. *Democratic Republic of Congo*,
  No. 21-7070, 2022 WL 2902083 (D.C. Cir. July 22, 2022) ............... 20, 21, 37

*Devengoechea* v. *Bolivarian Republic of Venezuela*,
    889 F.3d 1213 (11th Cir. 2018) ........................................................ *passim*

*Dinaco, Inc.* v. *Time Warner, Inc.*,
    346 F.3d 64 (2d Cir. 2003) ................................................................ 61

*Doe #1* v. *Red Roof Inns, Inc.*,
    21 F.4th 714 (11th Cir. 2021) ...................................................... 45, 54

*Dole Food Co.* v. *Patrickson*,
    538 U.S. 468 (2003) .......................................................................... 68

*In re Egidi*,
    571 F.3d 1156 (11th Cir. 2009) ........................................................ 52

*Fennell* v. *TLB Kent Co.*,
    865 F.2d 498 (2d Cir. 1989) ........................................................ 57, 59

*First Fidelity Bank, N.A.* v. *Government of Antigua and Barbuda*,
    877 F.2d 189 (2d Cir. 1989) .................................................. 27, 34, 44

*GDG Acquisitions LLC* v. *Government of Belize*,
    849 F.3d 1299 (11th Cir. 2017) .................................................. *passim*

*Graham* v. *R.J. Reynolds Tobacco Co.*,
    857 F.3d 1169 (11th Cir. 2017) ........................................................ 24

*Haynes* v. *McCalla Raymer, LLC*,
    793 F.3d 1246 (11th Cir. 2015) ........................................................ 33

*Hi-Tech Pharms., Inc.* v. *HBS Int'l Corp.*,
    910 F.3d 1186 (11th Cir. 2018) ........................................................ 42

*Holladay* v. *Allen*,
    555 F.3d 1346 (11th Cir. 2009) ........................................................ 17

*In re Home Depot Inc.*,
    931 F.3d 1065 (11th Cir. 2019)..............................................42

*Kennedy* v. *Floridian Hotel, Inc.*,
    998 F.3d 1221 (11th Cir. 2021)...................................15, 16, 17, 32

*Lane* v. *Pena*,
    518 U.S. 187 (1996) .........................................................19, 24

*Mullican* v. *United States*,
    252 F.2d 398 (5th Cir. 1958).......................................................22

*Nat'l Auto Lenders, Inc.* v. *SysLOCATE, Inc.*,
    433 F. App'x 842 (11th Cir. 2011) (unpublished) .............................60

*Norelus* v. *Denny's, Inc.*,
    628 F.3d 1270 (11th Cir. 2010)....................................18, 41, 42

*Orion Marine Construction, Inc.* v. *Carroll*,
    918 F.3d 1323 (11th Cir. 2019).......................................57, 58

*Peltz* v. *SHB Commodities, Inc.*,
    115 F.3d 1082 (2d Cir. 1997) ...................................................40

*Phoenix Consulting, Inc.* v. *Republic of Angola*,
    216 F.3d 36 (D.C. Cir. 2000).........................................16, 23

*Prod. Promotions, Inc.* v. *Cousteau*,
    495 F.2d 483 (5th Cir. 1974)...................................................40

*R&R Int'l Consulting LLC* v. *Banco
    do Brasil, S.A.*, 981 F.3d 1239, 1243 (11th Cir. 2020) .................*passim*

*Ramos-Barrientos* v. *Bland*,
    661 F.3d 587 (11th Cir. 2011) .............................................38

*Realty LLC* v. *Consulate of the State of Qatar,*
   No. 14-6429, 2015 WL 5197327 (S.D.N.Y. Sept. 4, 2015) ................................. 37

*Republic of Argentina* v. *Weltover,*
   504 U.S. 607 (1992) ........................................................... 70, 71, 72, 75

*Ruckh* v. *Salus Rehab., LLC,*
   963 F.3d 1089 (11th Cir. 2020) ............................................................42

*Sanderlin* v. *Seminole Tribe of Florida,*
   243 F.3d 1282 (11th Cir. 2001) ............................................................ 19

*SiaSim Columbia, LLC* v. *Scottsdale Ins. Co.,*
   No. 21-12918, 2022 WL 2352323 (11th Cir. June 29, 2022) ...........................43

*Singh* v. *U.S. Att'y Gen.,*
   561 F.3d 1275 (11th Cir. 2009) ............................................................ 18

*Stewart* v. *HHS,*
   26 F.3d 115 (11th Cir. 1994) ...............................................................43

*Thompson* v. *McHugh,*
   388 F. App'x 870 (11th Cir. 2010) (unpublished) ............................................ 20

*U.S. Steel Corp.* v. *Astrue,*
   495 F.3d 1272 (11th Cir. 2007) ............................................................30

*United States* v. *Amedeo,*
   487 F.3d 823 (11th Cir. 2007) ............................................................ 32

*Valambhia* v. *United Republic of Tanzania,*
   964 F.3d 1135 (D.C. Cir. 2020) ........................................................ 70, 71, 72, 75

*Voltage Pictures, LLC* v. *Gussi, S.A. de C.V.,*
   92 F.4th 815 (9th Cir. 2024) ...............................................................22

*Warciak* v. *Subway Restaurants, Inc.*,
    949 F.3d 354 (7th Cir. 2020)..................................................................57, 61

## Statutes

28 U.S.C. § 1291...................................................................................................I

28 U.S.C. § 1332...................................................................................................I

28 U.S.C. § 1605...................................................................................................I

28 U.S.C. § 1605(a)(1).........................................................................................17

28 U.S.C. § 1605(a)(2)....................................................................................17, 63

28 U.S.C. § 1605(a)(3).........................................................................................18

Dominican Law 247-12........................................................................................24

## Other Authorities

Rest. 2d Agency § 26...........................................................................................38

Rest. 3d Agency....................................................................................................47

Rest. 3d Agency, § 1.03 cmt. (c).........................................................................37

Rest. 3d Agency, § 2.01........................................................................................38

Rest. 3d Agency § 3.03........................................................................................44

Rest. 3d Agency, § 3.03 cmt. (b)....................................................................59, 60

Rest. 3d Agency, § 4.01(2)(a)..............................................................................46

Rest. 3d Agency, § 4.06.......................................................................................48

Rest. 3d Agency § 4.06 cmt. (b)..........................................................................45

## Jurisdiction

Plaintiff ("Ezemarval") invoked jurisdiction under 28 U.S.C. §1332. App.I.13, ¶3.[1] The district court dismissed the case for lack of jurisdiction because Inposdom is a sovereign immune from U.S. courts under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §1605.

This Court has jurisdiction to review that dismissal under 28 U.S.C. §1291.

## Introduction

Imagine a senior manager at the Federal Communications Commission signed a contract purporting to give an Indian company exclusive authority to manage the FCC's computer system—for a decade-long term. There was no procurement process of any kind; the senior manager had no authority to assign contracts on the FCC's behalf; and imagine the governing statute prohibits the FCC from outsourcing this function in the first place. But the

---

[1] Citations in the form "App.I.5" refer to Ezemarval's appendix, with three volumes. "Supp." refers to Inposdom's supplemental appendix. "Br." refers to Ezemarval's opening brief.

10-year, exclusive contract purports to promise a $10-million fee if the FCC terminates the contract; and it says the contract is governed by Indian law, the FCC waives its sovereign immunity from Indian courts, and subjects itself exclusively to their jurisdiction.

Now imagine the Indian company, attempting to legitimize this purported contract, provides an unauthenticated document stating it is a resolution by the Commission. And the FCC, called upon to defend itself in an Indian court, searches its records and finds that the supposed resolution is nowhere in its records; and that two of the "Commissioners" that appeared to sign the supposed resolution actually had no such station.

Now imagine the purported contract, purporting to accept the jurisdiction of the Indian court to adjudicate the $10-million claim against a U.S. federal agency, is in the Tamil language.

The United States would object vigorously if an Indian court asserted jurisdiction over the FCC based on a fictitious contract like that. But that is what Ezemarval demands this Court allow against the Dominican Republic. The "contract" on which Ezemarval bases its suit is a false document, contrary

in multiple ways to any authority given to its signer to act for Inposdom. And the supposed resolution of Inposdom's Board, endorsing the "contract," is also false. It is deeply troubling that Ezemarval persists in its effort to exploit U.S. courts for its scheme against Inposdom.

### ISSUES PRESENTED

1. Whether, given Dominican law prohibiting the formation of a contract like the purported Ezemarval contract, prohibiting an agency from waiving sovereign immunity on its own, and requiring approval from the President of the Republic or the legislature for such a waiver, Adan Peguero had actual authority to enter an agreement waiving Inposdom's sovereign immunity.

2. Whether Ezemarval preserved the claim that Peguero had apparent authority to enter such an agreement or that Inposdom ratified it.

3. If the Court even considers those claims of apparent authority or ratification, whether Ezemarval has alleged or provided evidence to support them, given that Ezemarval has pointed to no manifestation by

3

Inposdom expressing such intentions and the evidence shows Inposdom did not even know about the supposed contract.

4.    Whether Ezemarval has alleged an act by Inposdom in connection with commercial activity by Inposdom, given that Inposdom had no involvement in the purported contract.

5.    Whether, if there were such action, it had direct effects in the United States, given there was no obligation for Inposdom to make payments or do anything else in the United States.

## STATEMENT OF THE CASE

Inposdom is the Dominican Republic's statutory postal agency.  It is governed by a Board of Directors, and administered by a Director General under the Board's direction.  On August 16, 2020, Adan Peguero de Leon became the Director General.  Supp.59.  Just a year later, the President of the Republic suspended Peguero's appointment pending an ongoing investigation into "irregular activities" in his management.  *Id.*  The President installed Katiuska del Carmen Baez de Hilario immediately on an interim basis.  *Id.*

4

### A.    A fictitious contract purported to expose Inposdom to a $10-million penalty in U.S. courts.

On September 25, 2020, Peguero signed an agreement under which Ezemarval would cooperate with Inposdom for international cargo services. Supp.20-28.[2] That agreement, referred to here as the "2020 Agreement," is in Spanish, as required by Dominican law.  Article 14 of the 2020 Agreement allows either party to terminate on 60-days' notice, and the 2020 Agreement states no monetary penalty for a termination. Supp.27, art.14.    The 2020 Agreement has no clause purporting to waive Inposdom's sovereign immunity or otherwise agreeing to the jurisdiction of U.S. courts. Supp.20-28.

Yet on September 27, 2020, Ezemarval alleges, Peguero visited Miami to negotiate further with Ezemarval. App.I.13, ¶5.  Those alleged negotiations led to the signing of a different document, attached to Ezemarval's complaint.

---

[2] The 2020 Agreement recites the name "Mia Cargo Group," with the same principals as Ezemarval and the same address in Miami.  Supp.26. Ezemarval's complaint alleges that MiaCargo Group is a trade alias for Ezemarval. App.I.11-25.

App.I.18-25. That document, referred to here as the "Faux-Contract," is in English, contrary to Dominican law. It states a 10-year term, and it includes an extraordinarily onerous termination provision that Inposdom can terminate only by providing six-months' notice and then incurs a $10-million penalty. App.I.20, art.3. The Faux-Contract further states that it is under Florida law and courts in Florida are the exclusive venue for disputes; and a paragraph stating that Inposdom waives its sovereign immunity—**and that of every other Dominican government agency**. App.I.22, arts.11-12.

Ezemarval alleged that Inposdom's Board approved the Faux-Contract by means of a resolution on April 7, 2021. App.I.13 p.2, ¶7. Ezemarval acknowledges such a Board approval would be necessary before Peguero could sign a contract for Inposdom. *Id.* ¶6. But Inposdom officials—its current Director General and the Secretary of its Board—have searched Inposdom's files and can find no record that the Board discussed the Faux-Contract, and no record of the supposed April 7 Board resolution. App.I.156-158; App.III.62-63. Ezemarval submitted a purported copy of the Board resolution. App.II.47-53. That document bears names, as purported Board

6

members, of individuals who were not actually members of the Board and were not even associated with Inposdom.  App.III.63.

After the signing of the Faux-Contract, Ezemarval alleges, it "developed and implemented a centralized web platform to allow the centralization of all the services offered by INPOSDOM."  App.I.13, ¶8.  Ezemarval also alleges it "undertook" renovations at Inposdom's main post office, such as repair of the roof; and various other updates and upgrades to the building; and the purchase of computer equipment "that allowed INPOSDOM to effectively operate a postal system."  App.I.14, ¶9.  Ezemarval does not allege that these renovations and purchases were pursuant to the Faux-Contract or performed any particular obligation under the Faux-Contract.  *Id.*

## B.    Inposdom terminated the 2020 Agreement but not the Faux-Contract that it did not know about.

On November 16, Ezemarval alleges, the new interim Director General, Baez, announced at a press conference that she had "cancelled the contract between INPOSDOM and MIACARGO."  App.I.14, ¶10.  Then, on January 17, 2022, Inposdom sent notice to Ezemarval that Inposdom would be

7

terminating the parties' agreement in 60 days. Supp.29-30. That notice cited

the 2020 Agreement by its title (which is different from that of the Faux-

Contract). *Id.* And it quoted Article 14, the 2020 Agreement's termination

provision. *Id.* The January 17 notice did not mention the Faux-Contract.

On January 25, Ezemarval alleges, it "formally demanded that

INPOSDOM return all property and assets" of Ezemarval that were in

Inposdom's possession. App.I.15, ¶11. Ezemarval does not allege any

response, positive or negative, to this "formal[] demand[]." *Id.*

On February 17, Inposdom made a formal filing to terminate the 2020

Agreement. App.II.72-80. The February 17 filing cites the prior January 17

notice and again cites the 2020 Agreement by title. App.II.78. The filing

specifically mentions Article 14, the 2020 Agreement's termination

provision. *Id.* And, like the January 17 notice, it does not mention the Faux-

Contract. App.II.72-80.

On April 27, according to the complaint, Ezemarval wrote to the

Minister of Public Works and Communications "demanding that INPOSDOM

comply with the liquidated damages provision ... and return the property

8

owned by MIACARGO held in the Santo Domingo Postal Office." App.I.15, ¶14. The record includes no copy of this communication. Ezemarval did not allege any response, positive or negative, to that demand. But it later submitted a copy of the Minister's response, issued on June 7, 2022. App.II.84-88. That response did not say whether Inposdom would or would not pay $10 million or return any equipment. Instead, the Minister noted that Ezemarval had not identified what equipment it thought should be returned. App.II.85 ("[T]he petitioning company does not accredit or specify the assets to be returned.") (translated). And he explained that the Director General of Inposdom is the right person to contact with such requests because he has "the necessary competence to deal with the requested matter." App.II.86 ((translated).

Ezemarval does not allege that it followed up with the Director General.

**C.    Ezemarval invoked U.S. judicial authority to enforce the fictitious $10-million penalty.**

Instead, one week later, Ezemarval filed suit alleging that "[a]s of the filing of this action, INPOSDOM has failed to comply with ¶13 [sic] or returned any of the property owned by MIACARGO." App.I.15, ¶14.

Inposdom moved to dismiss based on its sovereign immunity.

Ezemarval had claimed Inposdom lacks immunity because it waived its immunity in Article 12 of the Faux-Contract and also "engag[ed] in commercial activity in the United States." App.I.13, ¶4. But the complaint provided no detail on either point. Inposdom raised factual disputes about both allegations, as permitted for a Rule 12(b)(1) motion. App.I.35. Inposdom asserted Peguero had no authority to enter the Faux-Contract or to waive Inposdom's immunity. App.I.35-44. And it pointed out there was no evidence that Inposdom's Board had even seen a draft of the Faux-Contract. App.I.38. Regarding commercial activity, Inposdom surmised that Ezemarval must be relying on a clause in the Faux-Contract that purports to acknowledge engaging in "commercial activity," App.I.37, art.12; App.I.45.

But Inposdom pointed out that Ezemarval had not actually alleged any commercial activity by Inposdom, given Inposdom had not entered the Faux-Contract; nor any act by Inposdom giving rise to the action. App.I.45. Inposdom submitted copious evidence, including a declaration from its Director General (Erick Alberto Guzman Nunez, who replaced Baez in August 2022); and an opinion from an expert in Dominican law. App.I.48-217 (Inposdom's opening exhibits).

Ezemarval also submitted evidence. App.II.26-209. It argued that Peguero did have authority under Dominican law for the Faux-Contract, and that the Board must have seen the Faux-Contract because the document was sealed by a Dominican notary. App.II.14. Ezemarval further contended that Inposdom's February 17 termination notice "rescind[ed]" the contract, a step that "[b]y definition … requires a valid contract." App.II.15. Ezemarval's argument about commercial activity did not specify where the supposed action giving rise to its claims took place—in the United States or outside— and did not explain whether a direct effect in the United States is needed and if so what it was.

The district court found that the preponderance of the evidence showed Peguero was acting outside his authority when he signed the Faux-Contract, and therefore the putative waiver clause did not actually waive Inposdom's immunity.  App.III.113-114.  The court then took Ezemarval to be arguing—consistent with the complaint's allegations—that "the act of entering into the Contract alone 'is engaging in commercial activity."  App.III.114 (quoting the Faux-Contract attached to the complaint).  That recitation was insufficient, the court found, and therefore Ezemarval "has not produced evidence sufficient to establish" the commercial-activity exception in the FSIA.  App.III.114-115.  Accordingly, the court dismissed the complaint for lack of jurisdiction.

## ARGUMENT SUMMARY

The Faux-Contract is not a real agreement by Inposdom.  It is a fictitious document that Peguero had no authority to execute on Inposdom's behalf, and that exceeded both Peguero's authority and Inposdom's authority in myriad ways.  Neither Peguero nor Inposdom had the authority to enter an agreement in a foreign language (English), for a private company to have a 10-

year concession to provide public services, and certainly no authority to waive Dominican sovereign immunity. The limitations are clear in Dominican law. Besides, even Ezemarval acknowledges that Peguero had no authority on his own for the contract; he needed authorization from the Board even if the contract were lawful. He did not have that authorization. The purported Board resolution is manifestly not what Ezemarval represents it to be.

Ezemarval's answer to all this is that Dominican law and circumstances are irrelevant because Peguero's authority is determined by U.S. federal law. No case that it cites has adopted such a remarkable doctrine. U.S. law has nothing to say about the scope of the authority of a mid-level functionary in a foreign country. What federal law provides is the *standard* for determining whether the facts of a case establish an agent with authority. Dominican law and government acts are among the relevant facts to be measured against that standard.

Ezemarval also newly contends that Peguero had apparent authority, and that at any rate Inposdom ratified the Faux-Contract. These are new

13

claims not presented below and therefore not proper for an appeal. And on their merits, Ezemarval does not even attempt the necessary showing. For apparent authority, it must show Inposdom or the Republic made some manifestation *to Ezemarval* communicating consent to be bound by Peguero's contracting. For ratification, it must show Inposdom actually knew about the Faux-Contract. Ezemarval neither attempts nor achieves either showing.

What remains is Ezemarval's assertion that the commercial-activity exception strips Inposdom's immunity. Here, the divide between reality and Ezemarval's arguments is particularly stark. The evidence shows that Inposdom did not even know about the Faux-Contract when Inposdom terminated a contract in February 2022. The termination notice makes plain that Inposdom was terminating the 2020 Agreement, not the Faux-Contract that Inposdom did not even know about. Then Ezemarval sued Inposdom before any termination remedies would have been due even if Inposdom had terminated the Faux-Contract. Ezemarval's entire case is built on an event that did not happen, leading to a breach that could not even have occurred yet, based on an agreement to which Inposdom was not a party. On top of that,

Ezemarval must show the fictitious events have a direct effect in the United States, and its only theory of that direct effect is a contract clause that manifestly does not obligate Inposdom to do anything in this country.

The authority of U.S. courts should not be used to perpetuate these shenanigans

## STANDARD OF REVIEW

Ezemarval asserts that the Court's review is *de novo* because the district court dismissed the complaint, and that the Court must "accept[] as true the complaint's well pleaded facts, even if disputed." Br.9. Neither assertion is correct. "Attacks on subject matter jurisdiction [under] Fed.R.Civ.P. 12(b)(1) ... come in two forms." *Kennedy* v. *Floridian Hotel, Inc.*, 998 F.3d 1221, 1230 (11th Cir. 2021). "Factual attacks," the second form, "challenge[] the existence of subject matter jurisdiction irrespective of the pleadings"; "extrinsic evidence may be considered"; and the trial court "is free to weigh the evidence." *Id.*

Inposdom explicitly presented a factual attack, by telling the court it "must go beyond the pleadings and resolve any disputed issues of fact," App.I.35, and by submitting extensive evidence. Ezemarval acknowledged

the attack was factual, by advising the court to "review the pleadings *and any*

*evidence before it*"; by stating the burden of proof was "a preponderance of the

*evidence*"; and by submitting evidence on its own side. App.II.12 (emphasis

added). Conduct like this constituted a factual attack against FSI jurisdiction

in *Phoenix Consulting, Inc.* v. *Republic of Angola*, 216 F.3d 36, 40-41 (D.C. Cir.

2000) (Angola "presented evidence that the written contract was a forgery"),

and in that case the D.C. Circuit said it was error for the district court to

"assum[e] the truth of an allegation of jurisdictional fact contested by the

defendant," *id.* at 40. Before exercising authority over a foreign sovereign, a

court has a duty to assure itself of jurisdiction. *See id.*

Happily, the court below clearly understood it was adjudicating a

factual attack: It reviewed the evidence and then said "[t]he Court *finds* that

Defendant has proved by a preponderance *of the evidence* that the FSIA's waiver

exception does not apply." App.III.118 (emphasis added). This Court

"review[s] for clear error the district court's findings of jurisdictional facts."

*Kennedy*, 998 F.3d at 1233 n.5.

"Clear error is a highly deferential standard of review." *Holladay* v. *Allen*, 555 F.3d 1346, 1354 (11th Cir. 2009).

> If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced … it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.

*Id.*

## ARGUMENT

Ezemarval has invoked two exceptions to sovereign immunity. First, it points out that the purported contract has a clause submitting Inposdom to U.S. courts in Florida, which clause, Ezemarval says, establishes the "waiver" exception, 28 U.S.C. §1605(a)(1). Second, Ezemarval asserts that Inposdom engaged in commercial activity having a direct effect in the United States, and thereby incurred the "commercial activity" exception, *id.* §1605(a)(2).

Many of Ezemarval's contentions have changed, as it presents new issues and claims not offered to the district court and leaves on the cutting floor much of its previous argument. "We cannot allow Plaintiff to argue a

different case from the case she presented to the district court," *Access Now, Inc.* v. *Southwest Airlines Co.*, 385 F.3d 1324, 1331 (11th Cir. 2004); accordingly this Court has a "well-established rule against reversing a district court judgment on the basis of issues and theories that were never presented to that court," *Norelus* v. *Denny's, Inc.*, 628 F.3d 1270, 1296 (11th Cir. 2010). Conversely, the issues and arguments that Ezemarval presented to the district court but does not offer here are waived;[3] a failure to present "argument or discussion ... constitutes abandonment of the issue." *Singh* v. *U.S. Att'y. Gen.*, 561 F.3d 1275, 1278 (11th Cir. 2009).

## I.   Peguero had no authority to enter the Faux-Contract or waive Inposdom's immunity from U.S. courts.

The Faux-Contract does say Inposdom will submit to U.S. courts. But the document is not a contract entered into by Inposdom, because Peguero had no authority to enter that agreement, and the waiver clause, on Inposdom's behalf. Such authority is a necessity for a document to constitute

---

[3] For example, below Ezemarval asserted the " expropriation" exception in the FSIA, 28 U.S.C. §1605(a)(3). Its brief to this Court does not mention expropriation.

an actual waiver by Inposdom. As this Court recognized in *Sanderlin* v. *Seminole Tribe of Florida*, about a Native American Tribe, a contractual undertaking by an official who lacks authority to waive sovereign immunity simply does not constitute a waiver. There, the Tribe's chief was perhaps authorized to enter the pertinent contract; but the Tribe retained its immunity because the evidence showed no "actual or apparent authority to enter into contracts … waived the Tribe's sovereign immunity." 243 F.3d 1282, 1286 (11th Cir. 2001). U.S. government officials of the U.S. government are similarly limited in their authority to waive its immunity: "A waiver of the Federal Government's sovereign immunity must be unequivocally expressed in statutory text," *Lane* v. *Pena*, 518 U.S. 187, 192 (1996); even formally adopted regulations cannot effectuate a waiver, *Thompson* v. *McHugh*, 388 F. App'x 870, 873 (11th Cir. 2010) (unpublished). "It is unimaginable that FSIA would authorize broader exposure to suit of a foreign government instrumentality … than that of domestic governmental units." *Arriba Ltd.* v. *Petroleos Mexicanos*, 962 F.2d 528, 537 (5th Cir. 1992).

In *CapitalKeys, LLC* v. *Democratic Republic of Congo*, the D.C. Circuit held that a contract purportedly entered by the governor of the Congolese central bank did not waive the bank's immunity, because "[n]othing in the pertinent [Congolese] law indicates that Governor Masengu enjoyed actual authority to enter agreements like the one at issue in this case without Board authorization, let alone to waive the Central Bank's sovereign immunity." No. 21-7070, 2022 WL 2902083, *2 (D.C. Cir. July 22, 2022) (unpublished *per curiam* judgment). Similarly here, it was quite proper for the district court to assess whether Peguero had authority for his purported contract. App.III.48, 113-114. A "waiver of sovereign immunity must have been made by someone who has ... the authority to act on behalf of the foreign sovereign with respect to such a waiver." *CapitalKeys, LLC* v. *Democratic Repub. of Congo*, No. 15-2079, 2021 WL 2255362, *9 (D.D.C. June 3, 2021) (citation omitted) (Ketanji Brown Jackson, J.), *aff'd*, 2022 WL 2902083.[4]

---

[4] *CapitalKeys* also discussed whether apparent authority, instead of actual authority, could have legitimized the purported waiver. Peguero had no apparent authority for the Faux-Contract. *See infra* at 43-49.

## A. Peguero's purported source of authority was false.

The complaint's sole allegation about Peguero's authority is that, allegedly, Peguero negotiated the agreement, "to be executed after [Inposdom] obtained the necessary approval from its Board of Directors," and then Peguero "obtain[ed] approval by its Board of Directors."  App.I.13, ¶¶6-7. Ezemarval's own lawyers had advised it, before contracting, that "the Board of Directors must authorize" the contract "by resolution."  App.II.59-60.

But there was no such approval.  Startling as it is for an allegation to be incorrect about a supposed public record, the evidence before the district court was conclusive on this point.

Inposdom submitted a declaration from Guzman, its current Director General, who had searched Inposdom's records and found no administrative action by the board authorizing the Faux-Contract. App.I.108-110. In response, Ezemarval submitted the supposed Bo ard approval, a resolution numbered 003 and dated April 7, 2021.  Supp.49-50.  The exhibit was not accompanied by any declaration, or even information, identifying where the

document came from.  Some such authentication is necessary before "copies of official records and documents can be properly admitted in evidence." *Mullican* v. *United States*, 252 F.2d 398, 402 (5th Cir. 1958);[5] *see also Voltage Pictures, LLC* v. *Gussi, S.A. de C.V.*, 92 F.4th 815, 833 (9th Cir. 2024) (affirming district court's refusal to notice a "purported Mexican court order," because defendant "did not certify the genuineness of the document").  Ezemarval offered no argument or evidence how a court could have confidence the document is an official record of Inposdom.  Evidently it is not.  After reviewing Ezemarval's submission, Inposdom submitted a declaration from the Secretary of the Board, who maintains the Board's records.  App.III.60-82.  She had searched Inposdom's files specifically for that resolution numbered 003.  She found no record of it, and no record of a board agenda corresponding to the claimed meeting on April 7, 2021.  Even more startling, two of the signers of the supposed board resolution were not, at the time, actually on the Inposdom board or even associated with Inposdom.  *Id.*

---

[5] Pre-1981 Fifth Circuit cases are binding precedent for this Court.  *Bonner* v. *City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) *(en banc)*.

In *Phoenix*, a plaintiff presented a contract, supposedly on behalf of the Angolan government, with an express waiver of immunity. 216 F.3d at 38-39. Angola submitted evidence that the purported contract was a forgery. *Id.* The D.C. Circuit held that facing that argument, the district court could not accept the plaintiff's allegations as true; it had to weigh the evidence and resolve the factual dispute. *Id.* at 41.

Here, the district court conducted the factual inquiry necessary under the FSIA, and found that Peguero "was acting outside the scope of his employment." App.III.113. Given the evidence, that conclusion was clearly correct.

## B. The Board had no authority to waive Inposdom's sovereign immunity.

The district court also found that Law 307, Inposdom's organic statute, "expressly limits Inposdom and its Director General's actions, which fundamentally do not include the discretion of either to renounce [Inposdom's] sovereign immunity." App.III.113. This determination, too, was entirely correct.

23

Inposdom's legal expert (Rodriguez) explained that under article 4 of the Dominican constitution, "there are no valid actions, powers, or attributions, unless they are expressly conferred by law." App.I.243, ¶65; *id*. ¶66 (drawing the principle also from Law 107-13, the analog to our nation's Administrative Procedure Act). "In short, the attributions of Inposdom and its General Director are limitedly established in Law 307 and neither Inposdom nor its General Director had the authorization within their discretion to waive the sovereign immunity that has been conferred to by law." *Id.* ¶67. In particular, Dominican Law 247-12 states explicitly that an agency like Inposdom has only "the specific powers or attributions determined by the law that creates [it]." App.I.Doc.36-1, ¶ 70 (citation omitted). These principles are the same as U.S. federal agencies. *Lane*, 518 U.S. at 192 (immunity waived only by statute); *Graham* v. *R.J. Reynolds Tobacco Co.*, 857 F.3d 1169, 1190 (11th Cir. 2017) ("[F]ederal agencies have only the authority granted to them by Congress.").

Further, Rodriguez explained that under article 220 of the Dominican constitution, government contracts with foreign entities must include

"submission to the law and jurisdictional organs of the Republic." App.I.242-243, ¶61. Consequently, any authority to waive immunity must, indeed, be a separate power, specifically conferred, and is not simply "an action that falls within actions to promote, improve, and maintain the operation of the Dominican postal service." *Id.* ¶63.

There is nothing in Law 307 that confers on Inposdom, or any of its officials, the authority to waive its sovereign immunity. Supp.31-41.

Ezemarval submitted the opinions of two lawyers (Peguero and Concepcion) who analogized to contracting by private citizens. That analogy is inadequate, just as it would be for contracting by a federal agency. Ezemarval's opinions noted a Dominican law that "recognize[s] that the contracting parties may choose a law of another country." App.II.114, ¶24; App.II.120-121. As Inposdom's expert pointed out, the cited law explicitly excludes administrative agencies. App.III.32, 36-37, ¶¶11, 24-26. Ezemarval's lawyers also invoked a principle from the Civil Code[6] that obligations freely

---

[6] The "Civil Code" is the basic law for private persons. App.III.30-31, ¶6.

undertaken are presumed valid.  App.II.144-145; App.II.118, ¶¶38-40.  But "in relation to administrative contracts," which certainly would include the Faux-Contract, "the norms of the Civil Code are not applicable."  App.III.30-31, ¶¶6-9 (emphasis removed; citation omitted).

Ezemarval's lawyers also offered misinterpretations of article 220—the constitutional provision making clear that authority to submit a government body to a foreign court is not an accessory to ordinary administration.  They pointed out that article 220 allows the government to submit contractual disputes "to jurisdictions constituted by virtue of international treaties" or to "national and international arbitration, in accordance with the law."  App.II.115-116, ¶28; App.II.147-148.  This clause, as Inposdom's expert pointed out, says nothing about submitting to foreign courts; it addresses only international treaty-based courts and arbitral tribunals—and always "in accordance with the law."  App.III.10, ¶¶20-23.

In short, Ezemarval and its lawyers offered no authority against the fundamental principle that a special conferral of authority would be needed for the Board or Peguero to have authority for the waiver clause, and they

26

identified no provision, particularly not in Law 307, that conferred such authority.

### C.   The Faux-Contract was beyond Peguero's and the Board's authority in multiple other ways.

Besides Inposdom's inability to waive its immunity, the Faux-Contract was, in its substance, far outside what the governing law, including Law 307, allows.

***First***, any procurement of services, must comply with Dominican procurement law—just as a U.S. federal agency must follow federal procurement rules.   Those requirements include a competitive bidding process.   App.I.236-238, ¶¶41-43.   Inposdom is fully subject to those requirements.   *Id.* ¶27.   Guzman's declaration established that the Faux-Contract went through none of the required steps.   App.I.55, 86-87.   A contract adopted without that compliance is a "nullity."   App.I.234.

***Second***, the particular services in the Faux-Contract would constitute a contract to "produce, operate or manage ... public service."   App.I.238, ¶45. That character is plain on the face of the purported contract, in that

Ezemarval undertakes to be "the exclusive provider of services for [Inposdom's] national and international distribution of CARGO." App.I.7. Dominican law, due to repeal of the pertinent statute, no longer allows such concession contracts. App.I.239, ¶48.

*Third*, any contract or record of a government body must be in Spanish, the country's official language; and any official document not in Spanish "shall be considered not valid." App.I.245-246, ¶¶76-77. Not only is the contract itself not in Spanish and invalid for that reason, App.I.246, ¶78; since it is not in Spanish, the Board could not legitimately have reviewed it and made an official decision about it, *id.* ¶77.

Against these concerns, one of Ezemarval's lawyers asserted that the Ezemarval contract falls within certain exemptions stated in the procurement statute. App.II.119, ¶¶42-44. This was simply mistaken; the asserted exceptions had already been repealed. App.III.34-35, ¶¶16-17. Ezemarval's brief below contended Inposdom has a special statutory authority to "[s]ign[] agreements with national and international organizations in reference to postal affairs." App.II.8, ¶9 (quoting Law 307, art.5(K), in translation). But

"national and international organizations" refers to governmental bodies ("institutions governed by public law"), not to private companies. App.I.242.

That was the extent of Ezemarval's effort, below, to refute the obviously correct assertion that the Faux-Contract was flagrantly contrary to applicable Dominican law. It offered no argument or evidence at all about the other problems mentioned above.

In this Court, Ezemarval makes barely any attempt to address those concerns, Br.34-36, even though Inposdom expressly raised these among the reasons the "contract" was outside the authority of Peguero and the Board. App.I.36-37. The procurement restrictions are among the limitations of Law 307 to which the district court referred, but Ezemarval does not challenge that aspect of the court's findings. Ezemarval notes it had cited, to the district court, the provision about signing agreements with "national and international organizations." But it makes no argument about what that provision means. "[A] party waives an argument if the party 'fail[s] to elaborate or provide any citation of authority in support.'" *U.S. Steel Corp.* v. *Astrue*, 495 F.3d 1272, 1287 n.13 (11th Cir. 2007).

Ezemarval also points out that article 220 is presumably not an absolute ban on waivers of sovereign immunity, because a previous decision of this Court held a different Dominican agency had expressly waived its immunity. Br.37 (citing *Architectural Ingenieria Siglo XXI, LLC* v. *Dominican Republic*, 788 F.3d 1329 (11th Cir. 2015)). As noted above, the import of article 220 is that the authority to waive is not an ordinary authority ancillary to administrative affairs, but rather must, if it can be done, be conveyed specifically by the legislature or the President. *Supra* at 25. That is exactly what happened in *Architectural Ingenieria*: "[T]he purchase agreement was submitted for legislative approval," and "the Dominican National Congress passed a resolution approving the purchase agreement." 788 F.3d at 1334. Perhaps for that reason, the Court's opinion does not discuss any question about article 220 (and therefore cannot be binding precedent about its meaning). That is also perhaps why Ezemarval says only that *Architectural Ingenieria* shows "the Dominican Constitution permits waivers of immunity under certain circumstances," Br.37, but then does not suggest such circumstances are present here. An act of the national legislature—

conspicuously missing here—is obviously key, consistent with Inposdom's

arguments.  App.I.39-40.

### D.  Ezemarval waived further dispute about whether Dominican law authorized Peguero or the Board to enter the Faux-Contract or the immunity waiver.

Ezemarval complains the district court did not adequately analyze

Ezemarval's evidence about Dominican law.  Br.35-36.  But there is no

requirement that a court specifically recite each piece of evidence that it

considered.   "[T]he judge is presumed to have discharged his official

responsibilities properly," and "[o]nly if no reasonable construction of what

the district court wrote can support a lawful judgment, will we find error."

*Burrell* v. *Bd. of Tr. of Ga. Mil. Coll.*, 125 F.3d 1390, 1395 (11th Cir. 1997).  The district

court stated specific findings and said they were based on "a preponderance

of the evidence."  App.III.113-114.  Ezemarval offers no reason to think the

district court failed to consider all the evidence before making that statement.

Mere "failure to discuss th[e]... evidence" does not show the court "erroneously

'ignored' or failed to consider th[e] evidence." *United States* v. *Amedeo*, 487 F.3d 823, 833 (11th Cir. 2007).

Ezemarval also complains in passing that the district court should have "taken testimony" about the content of Dominican law. Br.38. To the contrary, "an evidentiary hearing is not required," and the methods for resolving the factual disputes on a 12(b)(1) motion are "within the district court's discretion." *Kennedy*, 998 F.3d at 1232. Ezemarval never asked for an evidentiary hearing, so it cannot complain that the court did not conceive the idea on its own. "[T]he record before the district court was extensive and '[e]ach party had a full opportunity to present evidence.'" 998 F.3d at 1232.

In *this* Court, Ezemarval makes no actual argument that Dominican law authorized the Faux-Contract or the immunity waiver. It simply recites one-sentence summaries of "several arguments" it says it made to the district court, and provides for each a citation to its lower-court brief. This Court has expressly "rejected the practice of incorporating by reference arguments made to district courts." *Haynes* v. *McCalla Raymer, LLC*, 793 F.3d 1246, 1250 (11th Cir. 2015) (citation omitted). The Court "will not consider any arguments

32

a party attempts to incorporate" that way; by "fail[ing] to make any substantive argument" that Dominican law gave Peguero or the Board actual authority, Ezemarval has "abandoned this claim on appeal." *Id.* at 1250-1251.

### E.   Dominican law establishes the scope of authority for Peguero and the Board.

Ezemarval insists that Dominican law cannot matter, because it thinks this Court has held "federal law, not foreign law, determines" a person's authority to waive sovereign immunity. Br.35, 38. Ezemarval's cases do not establish that proposition, and exclude Dominican law from the question is contrary to basic principles of agency law.

*Aquamar S.A.* v. *Del Monte Fresh Produce N.A., Inc.* held that a court "should assume that an ambassador possesses the authority to appear before them and waive sovereign immunity absent compelling evidence making it 'obvious' that he or she does not." 179 F.3d 1279, 1299 (11th Cir. 1999). That overarching presumption, the Court said, is a matter of federal law as opposed to the law of any given U.S. state. *Id.* at 1293. But the Court nowhere purported to exclude the circumstances and the law of the foreign country from

33

providing the evidence that an ambassador does not have the pertinent authority. To the contrary, *Aquamar* disclaimed any holding that "courts should deem an ambassador to be authorized to waive a sovereign's immunity under all circumstances." *Id.* at 1299. In particular, "an ambassador's statements may so plainly contradict the position of his sovereign that they do not bind the sovereign." *Id.* To make that assessment, a court would have to look to exactly the sources—the official acts of the foreign government—that Ezemarval thinks are irrelevant. Moreover, *Aquamar* cited with approval the Second Circuit's *First Fidelity Bank, N.A.* v. *Government of Antigua and Barbuda* decision, and the *First Fidelity* approach of "direct[ing] the tril court to examine the circumstances surrounding the transaction." *Id.* (citing 877 F.2d 189 (2d Cir. 1989)). Neither *First Fidelity* nor *Aquamar* suggests that circumstances, including the legal context, in the foreign country must be excluded from the analysis.

The presumption from *Aquamar* is limited to one specific category of officials, namely ambassadors. The presumption arose because of "the unique qualities and powers of an ambassador." *GDG Acquisitions LLC* v. *Government*

*of Belize*, 849 F.3d 1299, 1307 (11th Cir. 2017). And that presumption does not apply here "because this case does not involve the acts of an ambassador." *Id.*

*Devengoechea v. Bolivarian Republic of Venezuela* concluded that, after *Aquamar,* apparent authority can permit an immunity waiver. 889 F.3d 1213, 1227 (11th Cir. 2018). But *Devengoechea* did not say federal law determines actual or apparent authority to the exclusion of the relevant foreign law. It simply concluded that allegations like "Venezuela initiated commercial dealings with plaintiff" and there were "officials sent by the Venezuelan government" sufficed—when "construe[d] … in the light most favorable to [plaintiff]" – to allege that the officials acted with actual authority. *Id.* at 1227-1228. An allegation that the sovereign itself sent the officials and initiated the transaction might suffice against facial attack, but this shows only that a plaintiff need not always allege a foreign law establishing an official's authority. Against Inposdom's factual attack disputed with evidence, *Devengoechea* does not show the foreign law governing an official's activities must be excluded. Indeed, its only statement about use of foreign law was to recite a "concern" expressed in *Aquamar*. 889 F.3d at 1227.

*GDG* said that very passage was dictum.  849 F.3d at 1307 n.3.  And *GDG* expressly disclaimed any holding that foreign law cannot be considered. "We offer no view on the wisdom or efficacy of using foreign law to illuminate the meaning of waiver because we need not use foreign law to arrive at an answer *in this case.*"  849 F.3d at 1307 n.3 (emphasis added).

In sum, none of Ezemarval's authorities makes foreign law irrelevant to questions about Peguero's authority.  At most, this Court's precedents teach that a uniform federal law, rather than U.S. state law, establishes the standard for what can qualify as actual authority.  There must still be some basis for that actual authority, and very often the law of the foreign country will be the most significant information about whether there is such a basis.  The Restatement itself notes that "[w]ithin public-sector organizations, the authority associated with a position is often defined by legislation or by administrative regulation."  Rest. 3d Agency, §1.03 cmt.(c).

Accordingly, courts around the country regularly examine foreign law to see what authority a putative agent from the foreign sovereign.  For example, *CapitalKeys*, drew its standard, for what constitutes authority, from

the Restatement—the same source that *GDG* used for the "federal law" on which Ezemarval relies. 2022 WL 2902083, *2 (quoting Rest. 3d Agency, §2.01); *GDG*, 849 F.3d at 1308 (quoting the same). The D.C. Circuit then examined Congolese law to see whether it established the agent's authority up to the standard in the Restatement. 2022 WL 2902083, *3. *1964 Realty LLC* v. *Consulate of the State of Qatar*, used the same standard for authority as *CapitalKeys* and *GDG*. It then explained that an agent's potential authority must be interpreted "in the light of all circumstances attending these manifestations [from principal to agent]," including Qatari law. No. 14-6429, 2015 WL 5197327, *6 (S.D.N.Y. Sept. 4, 2015) (quoting *Peltz* v. *SHB Commodities, Inc.*, 115 F.3d 1082 (2d Cir. 1997)).

This Court has said "the Restatement [] of Agency ... is a useful beginning point." *GDG*, 849 F.3d at 1308 (alteration an omission in original). In a situation like this, the Restatement points inevitably towards the foreign, *i.e.* Dominican, legal sources to determine what authority was actually conferred. The Second Restatement says "authority to do an act can be created by written or spoken words or other conduct of the principal which, reasonably

37

interpreted, causes the agent to believe that the principal desires him so to act

on the principal's account." Rest. 2d Agency §26. In *Ramos-Barrientos* v. *Bland*,

this Court held that plaintiffs had failed to make a case for actual authority

because they had introduced no statement by the principal permitting the

agent to take the accused actions. 661 F.3d 587, 600 (11th Cir. 2011). The Third

Restatement says "[a]n agent acts with actual authority when, at the time of

taking action …, the agent reasonably believes, *in accordance with the principal's*

*manifestations to the agent*, that the principal wishes the agent so to act." Rest. 3d

Agency §2.01 (emphasis added). Thus, both versions of the Restatement ask

what the principal has communicated to the agent about the principal's

wishes and the agent's authority. For an official of a government agency, the

laws governing the conduct of the agency's business are the most directly

relevant communications to examine.

### F.    Actions by Peguero and Ezemarval cannot establish Peguero's actual authority.

Despite insisting that federal law sets the standard for actual authority,

Ezemarval does not acknowledge what that standard is, and makes no

attempt to satisfy it.  Br.32, 38.  Instead, Ezemarval lists a collection of activities by Peguero and by Ezemarval itself.  It says "*Peguero* initiated commercial dealings" and then "[Ezemarval] performed work at Inposdom's headquarters."  Br.32 (emphasis added).  Ezemarval says "*Peguero* extensively negotiated the Agreement" and "[Ezemarval] obtained a legal opinion."  Br.31 (emphasis added).

None of this can show Peguero had actual authority to enter the Faux-Contract and immunity waiver, because actual authority "depend[s] for [its] creation on some manifestations ... by the principal, communicated ... to ... the agent."  *Prod. Promotions, Inc.* v. *Cousteau*, 495 F.2d 483, 493 (5th Cir. 1974).  "Actual authority 'is created by direct manifestations from the principal to the agent.'"  *Peltz*, 115 F.3d at 1088.  In a leading case, this Court held that when the facts "include[] no words or conduct of [the principal]," then no actual authority was created.  *Arriaga* v. *Fla. Pac. Farms LLC*, 305 F.3d 1228, 1245 (11th Cir. 2002).  None of the circumstances cited above constitutes any "words or conduct" by the Dominican Republic or by Inposdom indicating any consent to have Peguero undertake anything like the Faux-Contract.  Peguero, as the

putative agent, cannot create his own authority by initiating negotiations with Ezemarval. *See Peltz*, 115 F.3d at 1088 (requiring "direct manifestations *from the principal*") (emphasis added). Even less so can Ezemarval create authority for him by performing work or obtaining a legal opinion.

The only purported manifestation of assent is the supposed resolution by Inposdom's Board. Br.31. As discussed above, *supra* 13, the district-court record proved conclusively there was no such resolution.

## II. Inposdom did not ratify the purported agreement or convey any impression of apparent authority for Peguero.

Since the applicable law clearly did not empower Peguero with actual authority for the Faux-Contract, Ezemarval primarily asserts that he had apparent authority, and that at any rate Inposdom ratified the Faux-Contract by accepting its benefits. Each of these claims is wholly new. Indeed, Ezemarval acknowledges it did not mention apparent authority below. Br.31 n.1. It says it "preserved the issue of whether '[t]he Dominican Republic recognized the [v]alidity of the Agreement," but does not claim it made any

argument that Inposdom's acceptance of benefits constituted a ratification. Br.34-35 n.2.

There is a "wall[] of precedent" standing in the way, the "well-established rule against reversing a district court judgment on the basis of issues and theories that were never presented to that court." *Norelus*, 628 F.3d at 1296. "Issues not raised in the district court should not be considered on appeal." *Id.*

Ezemarval asserts it is allowed to present new arguments like these. Br.35 n.2 (citing *In re Home Depot Inc.*, 931 F.3d 1065 (11th Cir. 2019), and *Hi-Tech Pharms., Inc.* v. *HBS Int'l Corp.*, 910 F.3d 1186 (11th Cir. 2018)). In truth, this Court still rigorously applied its rule barring new issues, after *Home Depot* and *Hi-Tech*. Still, "this court will not address an argument that has not been raised in the district court." *Ruckh* v. *Salus Rehab., LLC*, 963 F.3d 1089, 1110 (11th Cir. 2020). Indeed, *R&R Int'l Consulting LLC* v. *Banco do Brasil, S.A.*, one of Ezemarval's main cases on the merits, refused to address a particular argument because "[appellant] failed to make that argument before the district court." 981 F.3d 1239, 1243 (11th Cir. 2020). "[T}here is a difference"—

set forth in *Home Depot* and many other cases—"between raising new issues and making new arguments."    931 F.3d at 1086.    The former remains prohibited.

Ezemarval's new theories fall on the wrong side of the line.  What is allowed is "a new argument or case citation in support of a position advanced in the district court."  *SiaSim Columbia, LLC* v. *Scottsdale Ins. Co.*, No. 21-12918, 2022 WL 2352323, *5 (11th Cir. June 29, 2022).  What is not permitted is a different issue on which the district court was "unable to … conduct any relevant fact-finding."  *Id.*  "[T]he resolution of factual questions can never be beyond doubt," so that taking up new factual disputes on appeal is improper. *Stewart* v. *HHS*, 26 F.3d 115, 116 (11th Cir. 1994).  Thus, new contentions that require additional factfinding must be on the "new issue" side of the line, because "prejudice is avoided by binding the parties to the facts presented … below." *Id.* at 115.

Both of Ezemarval's new theories require additional facts distinct from those it contested below.  Apparent authority requires a showing of "conduct of the principal which, reasonably interpreted, causes the third person to

believe that the principal consents to have the act done on his behalf by the person purporting to act for him." *Arriaga*, 305 F.3d at 1245 (quoting Rest. 2d Agency §27). The necessary manifestation is different from what is required for actual authority; the latter requires a communication from the principal to the agent, whereas for apparent authority "the manifestation of the principal is to the third person rather than to the agent." *Id.* (quoting Rest. 2d Agency §27, cmt. a). "A decision whether apparent authority exists thus requires a factual inquiry into the principal's manifestations to third persons." *First Fidelity*, 877 F.2d at 193. Thus, there is a sharp distinction, factually, between the actual-authority claim presented below and the apparent-authority claim advanced here. Further, for a claim of apparent authority Ezemarval must show it reasonably relied on the principal's communications. Rest. 3d Agency §3.03 (third party's belief must be "traceable to the manifestation [by the principal]"). The district court made no findings on either point, because Ezemarval raised no issue needing such findings.

Ezemarval's ratification theory also requires new and different facts. For example, "[r]atification requires that the principal have actual knowledge of material facts," i.e. the nature of the transaction that took place. Rest. 3d Agency §4.06 cmt.(b). "[T]he principal must … have 'full knowledge of all the material facts' for th[e] acceptance and retention [of benefits] to constitute ratification." *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 729 (11th Cir. 2021) (applying Georgia law). On that point, too, the district court did no factfinding because Ezemarval presented no contentions requiring such a determination.

Saying Inposdom "recognized the [v]alidity of the contract by rescinding it," Br.32, is not a ratification argument. Ratification means the principal "manifest[s] assent that the act shall affect the person's legal relations." Rest. 3d Agency, §4.01(2)(a). Disavowing a contract, under any wording, hardly constitutes accepting the contract.[7] In Ezemarval's briefing below, Ezemarval was plainly arguing, not that rejecting the contract constituted accepting it, but that the way Inposdom wrote about the contract

---

[7] As discussed above, what Inposdom terminated was actually the 2020 Agreement; Inposdom did not even know about the Faux-Contract.

was inconsistent with Inposdom's arguments about Peguero's actual authority under Dominican law. Had Ezemarval intended a ratification argument, it would surely have mentioned the applicable standard, and raised the facts that it now says are so important.

Moreover, Ezemarval's argument, that Inposdom's "rescission" showed Inposdom thought the contract was valid, is the opposite of ratification. "[R]atification starts with the assumption that the agent did not have actual authority at the time he acted." *GDG*, 849 F.3d at 1310. So a statement suggesting the contract was already valid cannot be an argument for ratification.

### A. Inposdom did not ratify Peguero's illegitimate signing of the Faux-Contract.

Ezemarval asserts a government "ratifies an agreement when it retains benefits generated by an agent's act." Br.33. That statement of the standard is incorrect and incomplete.

Under the Restatement, (which GDG endorsed, 849 F.3d at 1308),

"[a] person ratifies an act by (a) manifesting assent that the act shall affect the person's legal relations, or (b) conduct that justifies

a reasonable assumption that the person so consents." [Rest. 3d Agency,] §4.01. For example, a 'person may ratify [an] act through conduct justifiable only on the assumption that the person consents to be bound by the act's legal consequences.' *Id.* at §4.01 cmt. d. That is, if the principal engages in conduct that could be explained only by the principal's agreement to be bound by the agent's act, then the principal has ratified that act."

*Id.* at 1308-09.

In addition, as explained above, "[k]nowledge" is "[r]equisite to [r]atification." Rest. 3d Agency, §4.06 (heading). "A person is not bound by a ratification made without knowledge of material facts involved in the original act." *Id.*

Ezemarval's theory fails both requirements.

### I.   Inposdom engaged in no conduct manifesting a consent to be bound by the Faux-Contract.

Ezemarval asserts that Inposdom retained Ezemarval's equipment. Br.34. But Ezemarval has provided no evidence that the alleged equipment—or the alleged renovations at Inposdom's main post office—was part of Ezemarval's performance under the Faux-Contract.

Nothing in the text of that document calls for Ezemarval to provide equipment at Inposdom's offices. Nothing in it calls for Ezemarval to repair

Inposdom's roof, or otherwise renovate the main post office. The Faux-Contract says "MIACARGO shall forward and deliver to the Dominican Republic ... all CARGO received at its offices." App.I.19. "Its," in this context, obviously refers to MiaCargo's (i.e. Ezemarval's) offices, and the document nowhere suggests Ezemarval has an office in the Dominican Republic. Moreover, the structure of the sentence reveals that "its offices" must be located outside the country; it would make no sense to deliver *to* the Dominican Republic cargo received at an office *in* the Dominican Republic. The successive purported obligations of Miacargo generally have a similar structure, stating actions by Miacargo "at its offices." App.I.19. They must, similarly, be referring to Miacargo's offices. So Ezemarval's work was to be done at Ezemarval's offices, not at Inposdom's.

The few exceptions to that trend do not disturb the conclusion. Clause (B) states that Ezemarval "shall facilitate and provide monitoring and storage of CARGO in its possession." "Its" obviously refers to Ezemarval, and this clause gives no reason to think Ezemarval would have possession of cargo at Inposdom's main post office. Clause (G) says Ezemarval "shall, at all times,

make all Information available to INPOSDOM." *Id.* And clause (K) promises Ezemarval "shall maintain multiple service locations throughout the United States of America and the world." *Id.* While these clauses are consistent with operations at multiple facilities, neither of them gives any hint that Ezemarval will operate at Inposdom's own facilities, much less that Ezemarval will renovate them.

Against that plain meaning, Ezemarval offers no argument that the alleged equipment or repairs, were actually performance under the Faux-Contract. Whatever the reason Ezemarval placed equipment at the main post office and carried out renovations, those actions did not result from the Faux-Contract. Thus, even if Inposdom enjoyed those supposed benefits, it did not retain benefits from the act it supposedly ratified. It bears repeating, too, that Inposdom did have a contract with Ezemarval, the 2020 Agreement, which Ezemarval does not mention.[8]

---

[8] As noted above, the 2020 Agreement has no language that could even arguably constitute an express or implied waiver of sovereign immunity. *Supra* at 5.

Nor—even without Inposdom's factual attack on jurisdiction—can Ezemarval rely on its insistence on taking its allegations as true. There are no allegations in the complaint that the benefits Ezemarval supposedly conferred were actually results of the Faux-Contract.

### 2. Ezemarval has not shown Inposdom actually retained the alleged equipment.

At best, Ezemarval alleged that it placed the equipment at Inposdom's facility, App.I.14, ¶9(g), and that it has not recovered the equipment. Ezemarval alleged that it demanded the return of the equipment, and that by June 14, 2022, Inposdom had not yet done so. App.I.15, ¶14. But there is no allegation of why it was not returned, or how Inposdom responded to the request. In *GDG*, the foreign government had a lease of equipment, and it retained the equipment for "nearly six years," the full term of the lease. 849 F.3d at 1310. That, surely, amounts to retaining the actual benefits of the disputed contract. By contrast, that Inposdom had not returned Ezemarvel's equipment within a month and a half of the request—with no further

allegation about the interactions—does not show Inposdom intended to keep the equipment.

As the evidence showed, Inposdom communicated no such intent. After Ezemarval asked a senior government minister for the return of equipment, the minister responded simply that Ezemarval needed to identify more specifically what equipment it was asking about, and needed to direct its inquiries to Inposdom's Director General. App.II.86. No reasonable person could then infer that Inposdom intended to retain the equipment. Any reasonable person would simply have followed up with the Director General, providing more information, as suggested. That Ezemarval chose instead to sue one week later does not make a case for ratification.

### 3.    Inposdom did not know about the Faux-Contract.

Such knowledge would, as noted, be an absolute prerequisite for any ratification. In this Court, Ezemarval makes no argument at all that Inposdom knew of the document, and "[a]rguments not properly presented in a party's initial brief ... are deemed waived." *In re Egidi*, 571 F.3d 1156, 1163 (11th Cir.

2009).  Below, Ezemarval only pointed to three items of evidence that it thought might show Inposdom's awareness.[9]

First is the supposed Board discussion and resolution.  That evidence stands debunked; those documents are unauthenticated and Inposdom's evidence established, without refutation, they were not actual records of Inposdom and did not even involve the actual Board.

Second, Ezemarval argued that the seal of a notary on the Faux-Contract showed the Board must have seen the document.  App.II.14.  This was mistaken, because the notary was not an employee of Inposdom or the Board, but just one among many notaries working in Santo Domingo.  App.III.63, ¶9.

Third is Inposdom's termination of a contract, by advance notice on January 17 and then formal termination on February 27.  *Supra* at 8.  The termination documents refer to the 2020 Agreement by its title, a title that is

---

[9] This evidence was discussed not in support or opposition to ratification, (which was not at issue), but rather as evidence about whether the Board actually authorized the Faux-Contract.  App.II.14.

different from that of the Faux-Contract.  Supp.20-28; App.I.18-25.  Each of the notices cites or quotes Article 14.  That is the termination provision of the 2020 Agreement, whereas Article 14 in the Faux-Contract says nothing about termination.  Clearly, when Inposdom sent its termination documents, it meant to terminate the 2020 Agreement, so those documents do not reveal knowledge of the Faux-Contract.  Indeed they affirmatively suggest Inposdom did not know.  It makes little sense that Inposdom would terminate the 2020 Agreement while leaving in place another, more onerous agreement, if it knew of that other agreement.

This Court has repeatedly required a showing of actual knowledge to support a claim of ratification.  *E.g. Doe #1*, 21 F.4th at 729 (rejecting ratification because "[t]he Does did not plausibly allege that the franchisors had 'full knowledge of all the material facts.  Furthermore, the principal said to ratify a contract must know of *all* the facts.  In *Doe #1*, the plaintiffs alleged that the defendant's employees knew about illegitimate trafficking.  But, this Court observed, "that allegation alone does not rise to the level of plausibly alleging the franchisors' full knowledge of *all material facts*."  21 F.4th at 729.

Surely, two of the key "material facts" about the Faux-Contract are the $10-million termination penalty and the purported waiver of sovereign immunity. Ezemarval has provided no proof that Inposdom—beyond its agent Peguero—knew about those.

Instead of addressing the standard for ratification or trying to meet it, Ezemarval asserts this case is like *GDG* because Inposdom retained equipment belonging to Ezemarval. Br.34. But *GDG* was quite different. A government minister signed a lease for telecommunications equipment, with a term of five years, extendable for another five years, and monthly rent of over $330,000. 849 F.3d at 1302. The government made 40 of the payments, and used the leased equipment "for the duration of the two leases and, indeed, ... still has not returned the equipment." *Id.* at 1309-10. By the standards above, of course that constituted ratification. The Court explained that the payments must have manifested consent to the leases; "it is difficult to conceive of any other reason why the Government would have willingly made regular payments totaling nearly $13.5 million." *Id.* at 1309. There appears to have been no doubt the government knew about the lease

53

contracts; no government would pay out that kind of money without knowing why. Enjoying the benefits by using the equipment for *six years* "can[not] be understood absent the assumption that the Government intended to be bound by the [lease] agreement." *Id.* at 1310.

By contrast, none of those circumstances are present here. Inposdom made no payments at all. Unlike the case for a lease, Ezemarval's equipment has no self-evident relationship to the Faux-Contract. And Inposdom did not use the equipment during the full term of a lease, but instead simply asked Ezemarval to provide more information about what equipment it thought belonged to it. The only commonality between this case and *GDG* is an allegation that there was equipment. *GDG* is not instructive about these circumstances.

### B.    Inposdom did not convey any appearance of authority for Peguero to sign the Faux-Contract.[10]

Ezemarval acknowledges that apparent authority requires a reasonable belief by Ezemarval, with that belief "traceable to the principal's manifestations."    Br.29.    Indeed, this Court's precedents hold that for apparent authority the claimant must prove "conduct of the principal," a "manifestation of the principal to the [claimant]." *Arriaga*, 305 F.3d at 1245 (citation omitted).  Yet Ezemarval identifies not one communication or other manifestation from Inposdom to it.

Ezemarval says Peguero "traveled to Miami" for "extensive negotiations."    Br.30.    That is not a communication or manifestation by Inposdom.  Peguero is the asserted agent for whom Ezemarval is trying to show apparent authority.  The law of multiple circuits, including this one, holds that "apparent authority is created only by the representations of the

---

[10] As Devengoechea recognized, this circuit is in the minority of a split on whether apparent authority can serve to strip a sovereign of immunity.  889 F.3d at 1226.  Inposdom objects to the asserted use of apparent authority or ratification to strip it of sovereign immunity, and wishes to preserve for further review the argument that this circuit's precedents are incorrect.

principal to the third party, and explicitly rejects the notion that an agent can create apparent authority by his own actions or representations." *Fennell* v. *TLB Kent Co.*, 865 F.2d 498, 502 (2d Cir. 1989). "Statements by an agent are insufficient to create apparent authority." *Warciak* v. *Subway Restaurants, Inc.*, 949 F.3d 354, 357 (7th Cir. 2020). In *Orion Marine Construction, Inc.* v. *Carroll*, this Court rejected an assertion of apparent authority precisely because the asserted communications were from the agent. "[T]he record contains no evidence that ... the would-be principal ... made any 'manifestation' that would have clothed FDOT with either actual or apparent authority." 918 F.3d 1323, 1333 (11th Cir. 2019). The Court cited the Restatement for its "emphasi[s] that the 'manifestation' that gives rise to an agent's authority must emanate from the principal." *Id.*

Ezemarval says it obtained a law firm's opinion "confirming Inposdom's ability to enter the Agreement and waive its immunity." Br.30. A communication from a third party, not associated with the principal at all, is also not a manifestation from the principal. Furthermore, the law firm's opinion, reproduced at App.II.57-68, advised that Peguero did *not* have

authority on his own to enter the Faux-Contract. "[T]he Board of Directors must authorize, by resolution, the Director General of INPOSDOM to sign the contract." App.II.61. So the opinion undermines any claim that Ezemarval could reasonably rely on any manifestation short of a proper Board resolution.

Ezemarval says it entered the agreement only after Inposdom's Board approved it. Br.30-31. That supposed approval was false, as discussed extensively above. Besides, Ezemarval nowhere alleged, and it provided no evidence, that it actually received even the fictitious Board resolution. "[I]n order to create apparent authority, the principal *must manifest to the third party*" the consent to be bound by the agent. *Fennell*, 865 F.2d at 502; *see also* Rest. 3d Agency, §3.03 cmt.(b) ("[A]n agent's apparent authority originates with expressive conduct by the principal toward a third party."). A Board resolution, had it existed, would be an internal communication between the Board and Peguero, not from the Board to Ezemarval. So far as one can tell from the complaint and the evidence, Ezemarval's source of information about the fictitious resolution was not the Board or Inposdom—lacking

records of the document, Inposdom hardly have communicated about it to Ezemarval—but Peguero himself. "[A]n agent cannot create his own authority to represent a principal," *Auvil* v. *Grafton Homes, Inc.*, 92 F.3d 226, 230 (4th Cir. 1996), not even by fabricating a document purporting to be from the principal.

If Ezemarval did have a copy of the supposed Board resolution before it entered the contract, reliance on it could not have been reasonable. The document purports to be signed by six people. App.II.48, 53. But four of them were not members of the Board, and two had no association with Inposdom at the time. App.III.62-63. Those facts would have been readily available to any member of the public. So too would the fact that Inposdom's Board has only four members, and the law requires three of them for a quorum. App.II.30, art.4 (Law 307, establishing the Board); App.III.63, ¶8 (declaration from Board's Secretary, explaining the law determining a quorum). The supposed resolution is thus illegitimate on its face. "[A] party's reliance on an agent is unreasonable when that party has 'been confronted with circumstances adequate to put him on inquiry as to the legitimacy of the

58

agent's authority.'" *Nat'l Auto Lenders, Inc.* v. *SysLOCATE, Inc.*, 433 F. App'x 842, 843 (11th Cir. 2011) (unpublished) (quoting *Am. Lease Plans, Inc.* v. *Silver Sand Co. of Leesburg, Inc.*, 637 F.2d 311 (5th Cir. 1981)).

Next, Ezemarval says it "performed work at Inposdom's main postal facility," and "[n]ever received any indication that it was not authorized to be there." Br.31. Ezemarval is relying on silence; but "expressive conduct" is an "essential requirement," Rest. 3d Agency, §3.03 cmt.(b). Besides Ezemarval's claim of apparent authority depends on showing it "reasonably relied" on the principal's manifestations. *Warciak*, 949 F.3d at 357. Silent acceptance of Ezemarval's work, if that happened, was allegedly *after* Ezemarval executed the Faux-Contract. App.I.13-14, ¶¶8-9. "Apparent authority for an agency relationship depends upon reasonable reliance at the time of a contract"—not later after the contracting is completed. *Dinaco, Inc.* v. *Time Warner, Inc.*, 346 F.3d 64, 70 (2d Cir. 2003).

This discussion exhausts the list of circumstances that Ezemarval says established Peguero's apparent authority. Br.30-32. None of them

constitutes a manifestation by Inposdom on which Ezemarval could have

relied in entering the Faux-Contract.

### III.  Ezemarval has not alleged or proven the "commercial activity" exception.

In light of all the foregoing—the false Board resolution; the

unauthorized Faux-Contract; the 2020 Agreement, unmentioned by

Ezemarval, that was the only thing Inposdom actually terminated—

Ezemarval's invocation of the commercial-activity exception is patently

incorrect.  It bears repeating that the Court can indeed consider the actual

evidence, given Inposdom's facial attack, and is not obligated to accept

Ezemarval's allegations as true.   Ezemarval claimed that Inposdom

"engag[ed] in commercial activity in the United States."   App.I.13, ¶4.

Ezemarval now abandons that allegation to assert that Inposdom loses its

immunity due to an act *outside* the United States with a direct effect in the

United States.  Br.13.  The Court will search in vain for those allegations in the

complaint. App.I.12-16.

To establish the commercial-activity exception in the form it now attempts, Ezemarval must show its claim is based on "an act [by Inposdom] outside the territory of the United States"; that act was "in connection with a commercial activity of [Inposdom] elsewhere"; and that act "cause[d] a direct effect in the United States." 28 U.S.C. §1605(a)(2). The record belies each of Ezemarval's new assertions.

## A. *The case is not connected to "commercial activity" by Inposdom.*

Ezemarval explains at length what qualifies as "commercial." Br.15-16. But it does not dispute that the only putative activity on which it can rely is the Faux-Contract. Br.17-18. The "commercial activity" exception requires activity "by the foreign state," and consequently a court must inquire whether the alleged activity is indeed "attributable" to the foreign state. *Devengoechea*, 889 F.3d at 1226. The Faux-Contract cannot be attributed to Inposdom, for all the reasons explained above.

### B. Ezemarval's claim is not "based on" an act by Inposdom.

"[A]t at the first step in a commercial-activity-exception case, we must identify the conduct upon which the suit is based." *Devengoechea*, 889 F.3d at 1222. That conduct must be "[t]he conduct that actually injured" the plaintiff. *Id.* at 1223.

Here, Ezemarval asserts that Inposdom made a "decision not to perform," which Ezemarval says necessarily occurred in the Dominican Republic. Br.13-14. But there was no failure of performance at all, because Inposdom never terminated the Faux-Contract. Nor did Ezemarval really even allege that it did. The complaint said that in November 2021, Baez (the interim Director General) announced "she had cancelled the contract between INPOSDOM and MIACARGO." App.I.14, ¶10. The complaint does not identify *which* contract she cancelled. In February 2022, "MIACARGO was notified of the termination of the Agreement." App.I.15, ¶13. "Agreement" is not a defined term, and is not the title of the Faux-Contract. Yet again, Ezemarval did not allege *which* agreement was terminated. Its careful

wording choices are significant, given that the 2020 Agreement was in force, and the February 2022 termination expressly terminated *that* Agreement.

Ezemarval's case is entirely premised on a termination of the Faux-Contract that had not actually happened. The only "act" by Inposdom was the termination of the 2020 Agreement. The case is not "based on" that termination. Ezemarval studiously avoids mentioning the 2020 Agreement, and it has never suggested that Inposdom breached it. Ezemarval says Inposdom breached the Faux-Contract by failing to pay the $10-million penalty. Br.14. But the Faux-Contract only calls for that penalty after Inposdom terminates the Faux-Contract, App.I.20, art.3—and Inposdom had not done so.

Ezemarval also says Inposdom decided to breach in a second way, by "failing to return Miacargo's property." Br.14. This argument fails for the same reason: The only asserted duty in the Faux-Contract to return property comes from Article 9, and that clause is triggered "[u]pon the termination of this Agreement." App.I.22, art.9. No termination, no duty to return property;

and as noted, Ezemarval has not actually alleged or shown that Inposdom terminated the Faux-Contract.

Furthermore, while Ezemarval now asserts that it asked the Minister of Public Works and Communications about payment and the return of property, Br.14, the allegations in the complaint do not demonstrate any decision by Inposdom about either one. The complaint says only that Ezemarval demanded payment and property from the Minister on April 27, and that by June 7 Inposdom had neither paid nor "returned any of the property." App.I.15, ¶14. Nothing in the complaint indicates that payment and property would have been due by that date, or that Ezemarval demanded that they occur by any given date. Saying that Inposdom had not taken those steps by June 14, one-and-a-half months after the demand, does not show Inposdom had yet breached any obligation, much less decided to breach anything.

Yet again, the complaint's omissions are quite deliberate. The facts, shown in the evidence below (and discussed above, *supra* _) are that the Minister responded to Ezemarval's demand by asking Ezemarval to direct its

inquiries to the Director General.  Far from deciding to block or resist Ezemarval's request, the Minister sought to facilitate it.

### C.    *Even if Inposdom had terminated the Faux-Contract, the demanded performance was not due yet.*

Ezemarval alleged that Inposdom had "refused to comply with" Ezemarval's demand for the $10-million penalty and that Inposdom had not "returned any of the property owned by MIACARGO."  App.I.15, ¶¶14, 16.  In themselves, those circumstances are non-actions, not "acts."  "[T]he failure to act is not an act."  *R&R Int'l Consulting*, 981 F.3d at 1244.  What Ezemarval needs is a "decision by [Inposdom] ... not to perform."  *Id.*  Ezemarval does not allege an actual decision, and no decision not to perform can be inferred from the complaint because Ezemarval's own allegations show that performance was not due yet when Ezemarval filed.

Taking the Faux-Contract at face value, termination requires six-months' "written notice."  App.I.20, art.3.  The first written notice mentioned in the complaint about any termination was on February 17.  App.I.15, ¶13.  Had that notice been for the Faux-Contract, the termination would have been

effective on August 17. The alleged obligations to pay a $10-million penalty and return Ezemarval's property accrued, if at all, "[u]pon the termination." App.I.22, art.9. Yet Ezemarval sued on June 7, more than a month before performance was due. That Inposdom had not paid or returned property at a time when, under Ezemarval's own allegations, it was not yet required to do so cannot support an inference that Inposdom had, at that point, made a *decision* not to perform. "[T]he jurisdiction of the Court depends upon the state of things at the time of the action brought." *Dole Food Co.* v. *Patrickson*, 538 U.S. 468, 478 (2003).

Ezemarval criticizes the district court for evaluating the "commercial activity" exception tersely. Br.23-25. But the defects just noted are plain from the face of the complaint, and do not even need any evidence. The district court was not obligated to explain in detail why the complaint's allegations were deficient.

**D.    *Ezemarval's case is not "based on" a failure to return equipment.***

Ezemarval insists this case is like *Devengoechea* because that case involved a failure to return property and in this case Ezemarval alleges Inposdom possesses its property.  Br.13-14.  But the similarities end there, because the actual claim in this case is not "based on" the alleged failure to return Ezemarval's equipment.  A court must assess what act a plaintiff's "causes of action ... turn on." *Devengoechea*, 889 F.3d at 1223.  In *Devengoechea*, the plaintiff alleged an "agreement ... that Venezuela either would pay [him] for the Collection or would return it to him"; then, over several years, Venezuela did neither despite his repeated requests. *Id.* at 1219.  Thus, the failure to take one or the other action—pay or return—was the alleged breach.  Here, by contrast, the alleged failure to return equipment is peripheral to Ezemarval's claims.  Ezemarval does not ask for damages based on that failure, or for an order requiring Inposdom to produce the equipment itself.  The complaint asks solely for the $10-million penalty.  App.I.16.  Unlike the situation in *Devengoechea*, the allegations about return of equipment could be

deleted from the complaint without affecting Ezemarval's claim. So the claim cannot be "based on" the supposed withholding of property.

### E.    *The alleged failure to pay had no "direct effect" in the United States.*

It is well-established that "[m]ere financial loss by a person—individual or corporate—in the U.S. is not, in itself, sufficient to constitute a 'direct effect.'" *Araya-Solorzano* v. *Gov't of the Repub. of Nicaragua*, 562 F. App'x 901, 904 (11th Cir. 2014). *Araya-Solorzano* rejected an argument that nonpayment had a direct effect in the United States because the parties owed "live here, they are U.S. citizens, and … would be paid in U.S. dollars." *Id.* at 905. In *Valambhia* v. *United Republic of Tanzania*, the D.C. Circuit rejected an assertion of direct effect based on the fact that the sovereign had made past payments through a New York bank and it knew the plaintiffs live in the United States. 964 F.3d 1135, 1142 (D.C. Cir. 2020).

Ezemarval criticizes Inposdom's reliance on such cases, because they did not involve obligations to pay in the United States. Br.22. And it insists that *Devengoechea*, *R&R*, and *Republic of Argentina* v. *Weltover*, 504 U.S. 607

(1992), are controlling. Br.21. But it is missing the key point from those cases. *Devengoechea* interpreted *Weltover* to mean there is a direct effect in the United States when "monies or goods [are] due in the United States." 889 F.3d at 1125 (alteration in original). In *Weltover*, that was the case because "Respondents had designated their accounts in New York as the place of payment, and Argentina made some interest payments into those accounts." 504 U.S. at 619. In *R&R*, the bond instruments "promised that they could be redeemed at any of the Bank's branches, and R&R demanded payment at the Miami branch." 981 F.3d at 1244.

Ezemarval recharacterizes these cases to mean there is a direct effect when a plaintiff is "entitled to payment in the United States," Br.21, but that is not what they say. In each of these cases, the payment was specifically required to be made at a U.S. bank. As the D.C. Circuit analyzed the issue, such cases "involve some obligation, contractual or otherwise, to make payment into a *U.S. account*." *Valambhia*, 964 F.3d at 1142 (emphasis added). *Weltover*, in particular, involved a contract requiring "use of a New York bank account." *Id.* In *Devengoechea*, what was due was property rather than money, and the Court

69

stressed that this was "specific performance" that would have to involve return of the physical property to the United States.   889 F.3d at 1225. *Valambhia*, responding to *Devengoechea*, recognized that it "rel[ied] on multiple indicia of direct effect in the United States, not only payment within the United States." 964 F.3d at 1142.

Ezemarval cites no obligation to pay through a U.S. account such as was present in *Weltover* and *R&R*, and it did not allege any obligation to pay through U.S. banks.  App.I.3-25.  Indeed, the Faux-Contract says Ezemarval "shall be paid for its services ... in the manner ... set forth in Appendix A," App.I.20, art.4, and Ezemarval did not submit Appendix A, *see* App.I.24-25— a suspicious omission.  Ezemarval does not mention Appendix A and does not suggest it required payment through U.S. banks.  Nor does Ezemarval allege or cite any obligation to return property *to* the United States.  Indeed, the alleged failure was that Inposdom "refused employees of MIACARGO to retrieve its equipment ... *in Santo Domingo*," App.I.15, ¶12 (emphasis added), a complaint that belies the notion Inposdom was obligated to send the equipment back to the United States.

What Ezemarval does rely on—and *all* it relies on—is a clause in the Faux-Contract in which "INPOSDOM explicitly acknowledges that the Parties' performance under this Agreement shall occur in the State of Florida, where MIACARGO[] ... shall receive payment ... for services rendered hereunder." Br.22 (citing App.I.12, art.12). A talismanic recitation of this sort cannot generate a direct effect (and Ezemarval cites no case in which it did), because the "explicit[] acknowledg[ment]" does not actually create an obligation about the place of performance. On its face, the clause does not say either party promises to carry out all its performance in Florida. And it cannot be interpreted to commit either party to do that, because that meaning would make the contract nonsensical. For example, Ezemarval promised to "deliver to the Dominican Republic" the cargo it received. App.I.19, art.I(C). That performance cannot possibly be carried out *within Florida*. Ezemarval promised to "maintain multiple service locations throughout the United States and the world," App.I.19, art.I(K), an obligation that is expressly contemplated to take place *outside of Florida*. Inposdom purportedly undertook to "ensure the prompt and efficient processing of CARGO through Dominican

71

customs," App.I.20, art.2(B)—a task it surely would not do *in Florida*. And Inposdom purportedly promised to "authorize MIACARGO to place signs at IMPOSDOM's [sic] postal offices," App.I.20, which are, of course, not *in Florida*. Thus, whatever the Article 12 acknowledgment means, it cannot mean that Inposdom was obligated to carry out all its performance in Florida.

The acknowledgment specifically mentions that Ezemarval "shall receive payment" in Florida "for services rendered hereunder." That sentence is even further removed from an obligation. It does not say Inposdom promises to carry out the payments in Florida (much less through a U.S. bank, in Florida or otherwise); it simply recites that Ezemarval, as a company headquartered in Florida, will be receiving payments there. And even more so than the overall acknowledgment, this recitation cannot be interpreted to establish an obligation, because for the only payment "for services" mentioned in the Faux-Contract, the document specifically says those payments can be made "at any of the offices of either INPOSDOM or MIACARGO." App.I.21, art.8(B). The former are, of course, *outside of Florida*. Meanwhile, the $10-million penalty is not a payment "for services" at all. It is

"intended to reimburse MIACARGO for its expenses incurred in connection with creating and establishing the logistical system necessary to perform" services, App.I.21, art.3, and the document does not suggest this $10-million payment is covered by the Appendix A terms (whatever they are) that govern how "MIACARGO will be paid for its services," App.I.21, art.4. Thus, the only payment that Ezemarval claims as the basis for its action is not even covered by the Article 12 recitation about how Ezemarval will "receive payment for its services."

In short, Article 12 does not mandate any payments through U.S. bank accounts, the criterion that was important in *Weltover* and *R&R*. It does not mandate that payments be made in Florida, and it does not require any performance in Florida or in the United States. It is simply a recitation that Ezemarval, as a company headquartered in Florida, will enjoy the fruits of the contract there. It is nothing more than an "asserted direct effect ... that plaintiffs reside or are citizens here," which courts routinely find inadequate. *Valambhia*, 964 F.3d at 1142; *Araya-Solorzano*, 562 F. App'x at 905 (rejecting as

"insufficient" the fact that "[plaintiffs] live here … and would be paid in U.S. dollars").

## CONCLUSION

For these reasons, dismissing Ezemarval's complaint was correct, and the Court should affirm that judgment.

Dated: September 13, 2024      Respectfully Submitted,

*/s/ Keith Bradley*
Keith Bradley
Kayla Marie Mendez
717 17th Street, Suite 1825
Denver, CO 80202
Tel: (303) 830-1776
Fax: (303) 894-9239
keith.bradley@squirepb.com
kayla.mendez@squirepb.com

Raúl B. Mañón
200 South Biscayne Blvd, Suite 3400
Miami, Florida 33131
Tel: (305) 577-7000
Fax: (305) 577-7001
raul.manon@squirepb.com

SQUIRE PATTON BOGGS (US) LLP

*Counsel for El Instituto Postal Dominicano*

**CERTIFICATE OF COMPLIANCE**

1.    This document complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure P. 32(f) and Circuit Rule 32(e)(1), this document contains no more than 13,000 words, as determined by the word-count function of Microsoft Word 2016.

2.    This document complies with the typeface requirements of Federal Rule of Appellate Procedure P. 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Vollkorn Font.

*/s/ Keith Bradley*
Keith Bradley

## CERTIFICATE OF SERVICE

I certify that the foregoing document, together with appendices, was served on all parties to the proceeding in the district court by filing through CM/ECF.  All parties below are represented by counsel that has registered with the Court's CM/ECF system.

*/s/ Keith Bradley*

Keith Bradley